Good morning, Your Honors. May it please the Court, Robert Nersessian of Nersessian & Sanquist, appearing for the Plaintiff Appellant, Lori Tsao, a.k.a. Lori Chang. Your Honor, I'd like to start by highlighting the summary judgment granted to Desert Palace in this case, and I would suggest that the Court erred, and erred grievously, in dismissing the state law claims against Desert Palace. The Court's sole rationale in dismissing, in finding summary judgment for Desert Palace, also which we all know is Caesars Palace, relied upon a probable cause analysis. Concerning a misdemeanor, false imprisonment by a private party turns on whether a crime was actually committed. The statute seems to read that way, but is there any case law? Yes, Your Honor. We cited to Muniz v. Melman and Barletta v. Golden Nugget, and that's 580 F. Suff 614. And Sheriff, it is alluded to in the case out of Nevada, Sheriff County of Washoe v. Smith, that's 542 P. Second 440. And, yes, the statute does indicate that. It also, the corollary statute, NRS 171.124, with respect to police officers. But, Sophie, earlier when I said is there any case law, I mentioned is there any Nevada case law, and the answer is, from what I understand from what you said, is not really. I think that the decision in Sheriff, in Sheriff of Washoe County v. Smith, could not have occurred were that not the case. Although it is not expressed in those terms, it is definitely, I feel as I recall the case, it would be background that was necessary for the determination there. As it is undisputed that the plaintiff was detained, the question of whether the question for false imprisonment is whether legal authority exists to detain. And a casino in Nevada has three opportunities to detain an individual. One, reasonable suspicion of a felony. Two, reasonable suspicion of a gaming offense. And three, as just mentioned, actual, the commission of an actual misdemeanor in their presence. With that being said, the district court did err in granting summary judgment and also erred in denying the summary judgment with the detention being evident. Minimally, nonetheless, there would have been a question of fact as to whether or not a crime occurred. And the judge apparently, if there were summary judgment granted here, he would have to jump forward past the entire trial process and determine that this was criminal. And we briefed that thoroughly. But that whole set of – insofar as you're talking about Caesar's Palace or you're talking about the trespass claim, and then in order to get there, you'd have to prove that the trespass was not with probable cause. And in order to get there, you have to get essentially to this consent issue. Is that right? Well, I would agree that the consent issue is an issue, but I think it's an issue that has been contrived by both the district court and by defense counsel. Pointedly, it is functionally impossible with Citation 5d to invite somebody and then say that they're trespassing. And the record is replete with three invitations, and even an invitation after this case was commenced to Laurie Tsao to come into Caesar's Palace and gamble. And in that respect, Your Honors, I would also point out that those invitations, when they were sent, were sent to a person that they knew was trespassed or that had been trespassed, Laurie Tsao. Was there reason for her not to think that they might well have been in error or not been? Your Honor, that reverses the burden completely as to the social interaction amongst these parties. How could it be plaintiff receives an express invitation through, call it negligence or call it, which is more likely, a competing fight within Caesar's Palace as to whose money they're going to try to take? If marketing wants her money and says, come on in, and security doesn't want her in, that's their burden to figure it out. And when they don't figure it out and send mixed messages, the only proper course would be to default in favor of the express written invitation. And that is what Ms. Tsao had. And I would go to the record at, I believe, 103, 109, and 118, the excerpts of record. In all three of those, it is Laurie Tsao that isn't, that is told don't come back, as stated and expressed in writing by Caesars. And then subsequently, in all three cases, she gets an express invitation in the name of Laurie Tsao. You know, there's a lot of issues here, and we're not going to hold you to the 10 minutes, but maybe you should discuss some of the 1983 issues. I would be happy to, Your Honor. Let's turn to the probable cause issue under 42 U.S.C. 1983. And under the district court's reasoning, probable. Well, it's the same issue, right? Well, either is or isn't the same issue, but go ahead. Well, it also, this one adds the 1983 claim and also adds Officer Crumrine to the analysis and to what we're looking at. And, Your Honors, I would point out that under the district court's analysis functionally, every Asian emigre from China, Vietnam, Korea, or Japan, or even first generation people, are ripe to be arrested for probable cause if this analysis is to be accepted. What I'm pointing out here is every one of those people likely have two names or even three names. They certainly have their given name. They have their given name reversed. But moreover, in this case, it was actually explained. Pardon? It was explained to them what the issue was. Yes. Before Officer Crumrine took Laurie Tsao off to jail, and this isn't even an Asian issue so much as an American issue vis-a-vis given name versus married name. And she provided a married name that was on her United States passport. And the important part here, and this is really where the district court seemed to step beyond the record before it, the district court literally states that she had plenty of opportunity to explain the discrepancy. Your Honors, with this record was provided a video, and it can be watched forwards, backwards, in slow motion. Every word can be deciphered. Nowhere in that video is Ms. Chang, Ms. Tsao ever given the opportunity or even the knowledge that Officer Crumrine takes the slightest issue with her name, not once. The judge says that she had plenty of opportunity. Where, how, or when, she didn't even know that she had given Officer Crumrine a name he did not recognize. And then when he is told, oh, wait, there's an explanation for this, not by her directly, but still by her through her attorney, and that that is her married name, and that attorney can have somebody down here with documents to show that it's a true and correct name, too, her husband, he says, goes back in, says to the officer with Caesars, wow, that was a mistake, still doesn't say anything to Ms. Tsao, and hauls her off to jail. That is the case of Arpin v. Santa Clara County, I believe, personified. Secretly talked to and relies solely upon information from a third party vis-à-vis the trespass arrest. I have two questions I want to ask you. First, as to the arrest by the security officer, the citizen's arrest, are you complaining, A, that they should not have arrested her because of the invitation, but, B, are you No, I never argue that the handcuffing was excessive force. The handcuffing is a battery if there is no legal authority to detain. What if there is legal authority to detain and they say, we want you to come across to the room across the hall, does that give them a right to use handcuffs? Oh, wait a minute. I'm sorry. I was thinking of Officer Crumright. No, no, I'm asking about the security guard. I would suggest that a security guard, first of all, the police, up until the point of arrest, absent articulable circumstances, this would be Terry, that there are facts that cause them to fear for their safety, wouldn't even be authorized to put on police or handcuffs. The manacles here, yes, I would suggest that that was excessive force because the force for me is not what you call a battery. Are you suggesting that's battery? Yes. Handcuffing absent legal authority or absent justification is offensive in its very nature. Well, offensive is not enough, really. But I mean, you do have a count for battery, is it? Yes. But what about, is it also pertinent to the State action question? In that he – my understanding is that he would have had authority to cite her directly had she had identification. And if he didn't think he had the authority to cite her directly, would he have had the authority to handcuff her? In other words, does a security guard who is only going to do a citizen's arrest have authority from the State to – or is it a State wrong to handcuff somebody, even if they have probable cause? Can they handcuff somebody? Your Honor, that is – since we're dealing with State law claims here, that's not an issue that has, from the research that I've been able to see, ever been determined. And I would suggest that the determination of that issue would be an extrapolation of the Terry, where if there are articulable – if there are articulable circumstances that show that they have any reason to fear for their safety, then perhaps they would be authorized in an – in a legal arrest. Is that true of any citizen's arrest? Or is that peculiar to the security guard arrangement with the police? See, this is – and thank you for bringing that up, Your Honor. I think we're on an issue here that is very pertinent to this, because so far as Nevada goes, and so far as this police officer goes, and so far as these security officers go, they all think that there's some kind of huge extra authority that ties with that. They are any citizen, Your Honor. The only difference here is that they are also a citizen with CELA authority, which gives them the ability to cite – not arrest, cite. But the cite – the arrest would still be a citizen's arrest. So even though he didn't ultimately give her CELA – a CELA citation because she didn't have identification, the arrest was presumably influenced by the fact that he thought he had that authority, right? He believed, as I understand it, that he was conducting a valid citizen's arrest, or that's what he's maintained. A citizen's arrest or a CELA arrest? A citizen's arrest. There's no such thing as a – I would suggest that there's no such thing as a CELA arrest. There would be a CELA detention. The United States Supreme Court, which would be a seizure, Terry again, and you have to stop, you have to hold, you have to detain that person in order to write that ticket, that CELA ticket. So there is a seizure under the Constitution to issue that CELA citation. However, that seizure ripens into an arrest when they contact the police to convert it to an arrest or their alternative under that law, and I believe even the law here is to physically take that person before a magistrate. If he did a CELA arrest, it seems to me there would be little doubt about the State action question, because at that point he would be acting with the authority of the State. He would be essentially performing a public function. Even under the very confused law about when a security guard is performing a public function. Once he actually has the authority from the State to issue a citation, presumably he's then performing a public function. Your Honor, I would agree and also highlight that the CELA detention is itself a seizure, and therefore we don't even have to get there. So you would say the fact that he detained her in order to find her identity to see if he could do a CELA arrest. It's itself a seizure. And therefore what? It's a public function for State action purposes? Absolutely. That seizure was the first step in a process that goes stop, seize, require identification, issue a criminal summons to appear in court and answer for criminal charges. That's a private party. Those are very broad authorities that have no relation to women care or no relation to private parties. What does an ordinary citizen who makes a citizen's arrest, what authority does he have? A citizen approaches another citizen and says, I'm making a citizen's arrest. The authority is that at that point the person is arrested. If they resist or protest, they could be taken into custody by the other citizen, and then the common law is immediately taken before a magistrate by the other citizen. That has been modified by some California authority that says you also can accomplish that common law by immediately summoning the police and turning over the arrested individual to that police officer. Both of those would be a citizen's arrest. But the citizen in a citizen's arrest, the citizen can seize the person he's arresting. Yes, Your Honor. I can't say they can't. Yes, they can seize the person that they are arresting. But the caveat you say is that it's all on pain of making – if you make a mistake, it's your problem. At least as far as to a misdemeanor. Under 171.126, which is the private party one, it is, as I recall, always at your peril. And that's the language they use in the cases that talk about the common law rule. Those arrests are at your peril. Even as to a felony. Even as to a felony for private citizens. The police statute, 171.126, differs in that the arrest for felonies and reasonable suspicion of those for a police officer are different, and it's not at peril. However, the arrest for a misdemeanor under 171.126 has very different language for a police officer than the other ones. And in those circumstances, it is at the officer's peril. And that's part of the state law claims against Officer Crumrine. Your Honors, I want to highlight that in the United States Supreme Court case, Atwater v. Lago Vista, the United States Supreme Court expressly stated that we don't want our test, our constitutional test, is only probable cause crime. We don't want to limit, and in fact, we would even encourage states to enact less or more restrictive arrest statutes vis-a-vis their laws and their citizens. And that is exactly what Nevada has done in 171.124 and 126. And they have said that crime has to be committed for both police and citizens if it is a misdemeanor and it's allegedly committed in your presence. You do those arrests at your peril. And in the case of the police, though, isn't the State law, I mean, haven't the cases assumed a probable cause standard in the case of the police? They have up until very recently, Your Honor, because it isn't an assumption question. What it is was a discretionary function immunity question under a case called  And we didn't get to that question because the police were granted that immunity. Today, Reyna v. Ortega has been overruled by a couple of cases, and we now have the situation wherein I think I cited two Nevada District Court cases in my brief, and I could find that if you wanted me to take the time or bring it up on a rebuttal. But those two cases expressly say there is no longer immunity in Nevada for intentional torts. Now, returning to Sheriff of Washoe again, that would reenact the historic common law rule, get rid of Ortega v. Reyna, and today the police are exactly at risk the way the statute says. And Atwater makes it clear. Is that retroactive? Yes, it is, because it was applied retroactively in actually I think that this arrest occurred before Ortega or after Ortega v. Reyna was even modified. So or changed or overruled or however you want to look at it, and the discretionary function immunity test was further explained by the Nevada Supreme Court. I would close, because I know I've gone way over. That's what I was about to say. With just pointing out that so far as the attorneys' fees issue goes, there is not one proposition in any of our briefs that was, in any of Plaintiff's briefs, that was not supported by legal authority and a good-faith argument that it applied. And with citation to facts that could be demonstrated, and in that sense the action was not frivolous. The district court applied the wrong standard and said, because I granted summary judgment a fortiori, this is a frivolous case. It is not. It wasn't. And I thank you very much for your time and ask if there's any further questions. Mr. LaRosier, when you come to rebuttal, it would be helpful for me to know a little more about your theory as to the liability of Desert Palace, Federal liability. I thank you for alluding that I'm actually going to get some rebuttal. So, okay. Well, yes. I'll step down. I'm sorry. It's a vicarious liability agency problem. Okay. May it please the Court, Your Honors. Thomas Dillard in Las Vegas, Nevada, on behalf of Defendant Annapoli Desert Palace, more commonly known as Caesar's Palace. We're here on an appeal of a 37-page order from the Honorable District Court Robert Jones. I'm unaware of any factual contention in this appeal that counsel takes exception with. Well, there are factual contentions having to do with, for example, who was responsible for the arrest, as I understand. What was the relative roles of the Caesar's Palace security officer and the officer Cromerine, for one thing? Well, Your Honor, I think the record is... Are you saying that if you're not entitled to summary judgment, the other side is? No, Your Honor. All I'm saying is the lengthy order. I think counsel makes some legal arguments that Judge Jones took some, misapplied the law, but in terms of his factual recitation of the case in the order, I'm unaware that he's making a challenge that factual determination made by Judge Jones was made an error. He makes issue with these revocation claims that the invitations itself revoked five times, and that's posed to the court. I've taken... Well, if it's a legal question, which it probably is, then it's not really a question of what Laurie South thought or didn't think about it, right? It's a question of objectively, was this a consent? Well, the facts in this case, and it's undisputed, was, and Laurie admitted to these, she was trespassed from Caesar's or Herod's properties on five occasions prior to this. Okay. And that three of those occasions, I believe, or two of those occasions, she was trespassed under the name of Laurie South. Two others, they were different names, but particularly six months before this incident, she was trespassed under the name Shea Yudeng. In fact, the security guard that took her into custody on this particular day was the very security guard that encountered her when she was trespassing her Shea Yudeng. When she came back to Caesar's Palace, notwithstanding those earlier trespasses, the facts are undisputed that she was wearing a large hat. She was playing under a name Monica Liu. This was a gambling card which she just found on a table and decided to use and call herself Monica. That she did not have any invitations, nor did she ever get an invitation ever in a mass mailing that suggested Shea Yudeng was invited back to the property. The officer that encountered her recognized her as the person. Was there a record of her as Sal at the casino? I'm sorry, Your Honor, I didn't catch that. Was there any record of her as under the name Sal at the casino? There was a record of a person named Sal. The security and the corporation in general did not connect all the dots, if you will, with all the names she was using and all the – that she was the same person. One of the names she had been trespassed under was Sal? That is correct, Your Honor. Okay. So then what you say is when he then invited her to return, it was a mistake. Yeah. Whatever the mass mailing, whoever did that was – It was addressed to her individually under the name Sal. That is correct. Yeah. As Judge Jones pointed out, engage in a limited activity of watching basketball games and having a room, not playing 21. But there's no case law to suggest that that's reasonable for her to assume that every name for which she was trespassed under was revoked and she was able to come back under a different name, in this case Monica Liu, to come back to Caesars to gamble at a 21 table. No, you're not saying that if she'd come back under the name Sal, it would have been all right, are you? Well, there's no – there's no authority I've seen for that proposition. I don't think it's reasonable. In fact, I think her conduct in here speaks volumes in that she came back under a disguise and was not using the name Sal, did not have invitations in her possession suggesting that that's why she was there. She was there in a disguise and she was using the name Sal. But her lawyer came later and did have these things in her possession. So the fact was – the one thing it seems to get off the table is whether or not the Caesars Palace security guard knew that. I mean, whether it's worth anything or not is another question, but he didn't know it. He did not know it. What do you mean he didn't know it? He didn't know it. The officer gave it to him. Oh, I'm sorry. Gave it to the other – to the other guy. Your Honor. Who may or may not have told him. That's correct. And the evidence is undisputed on that. The security officer had no encounter with the attorney. Mr. Necessi and the attorney here spoke to the arresting officer of Las Vegas Metro, had no conversations at all with the security officer involved. And there's no evidence to suggest he was aware of any invitation at all, let alone an invitation suggesting Shea Yudeng, the person he trespassed six months earlier, was invited to come back. Can you tell me, is there – was there some reason they handcuffed her and took her across to another room? Well, she was – there's no question in the case, Your Honor, that she was arrested, that a citizen's arrest was – was done. There's been no claim in this case that the – that there was excessive force. No, they claim a battery. They say that putting the handcuffs on her is a battery. The battery theory that was before Judge Jones was simply that, from plaintiff's standpoint, that the seizure period was unlawful and is really a redundant or superfluous claim to false arrest. Ms. Stahl testified that she was not injured, she did not hurt, she didn't have any discomfort from being handcuffed. But – and there was really no evidence put on at summary judgment phase on the question you're asking, Your Honor, because it wasn't a theory of recovery at all. And the first thing I've heard him say about that was an answer to your question a couple minutes ago to suggest that using cuffs per se was unreasonable. Well, what was the battery claim? The battery claim was simply that, from plaintiff's standpoint, that there was no basis, legal basis to affect a seizure. And therefore, putting the battery – the handcuffs on her was a touching – so it was related directly to the handcuffs, because the only thing that made it a battery was that they touched her. Well, I think they touched her at all in terms of escorting her back to security. But it wasn't in the form that, assuming that it was a lawful seizure, that placing cuffs on him, on her, was unreasonable under circumstances. But does the fact that she testified that she wasn't hurt, does that – does that obviate any battery claim as a matter of law? Well, the law gives, even citizen's arrest, Your Honor, the ability, in fact, as Mr. Session aptly pointed out, to use reasonable force to bring a person to a magistrate. Now, that's – that's the common law and not real practical in the – But reasonable force means it's a reason to use force. That it's – that it's reasonable under the circumstances to take a person into custody. In this case – Well, no. No. They're two different things. It's reasonable to take somebody into custody. You say you're in custody. He says, great. I really admire you for doing your job. He said, I want to take you to the police station. You're absolutely right. I'm happy to come along. Can you use force there? Well, if the – the question in a battery sense is I agree with you. It was reasonable under the circumstances. But what I'm – I guess I'm having difficulty responding to your question, Your Honor, because the record is devoid of any evidence on this because it wasn't litigated in that fashion. All right. Okay. It was simply whether the arrest period was lawful. And we've split up five minutes, and I've taken nine of us. Unless there's any specific questions, I'll – No. We're going to give you more time. Okay. Fair enough. Thank you, Your Honor. Are you splitting the argument? Yes. Counsel for Officer Crumline is here as well to offer to you. All right. Well, we'll give you one more minute, and then we'll get to you. Okay. Fair enough. Counsel, the plaintiff did not file a reply brief to the answering brief, and in large part, as I understand, for the Federal claims is – is said very little in regard to the elements he's got to reach. From the back end, they've – he's only sued Caesars Palace directly, which must fulfill the elements of Monell. And there's no evidence to suggest that at all. Is there a case law saying that if there's otherwise state action when you're dealing with a private defendant, you have to fulfill Monell? Yes, Your Honor. What's that? That section is in our brief, and there are several cases cited on that, beginning on page 28. I would, Your Honor – So then my understanding is that the contention is that this isn't really a vicarious liability. That's the plaintiff's contention, that he's suing Caesars directly for – because the agent is a – the security guy was an agent of Caesars doing what he was supposed to be doing, and therefore, there's not really a vicarious liability problem. The argument made in the briefs from – from counsel to try to reach Monell elements was that the mailings itself represented a policy, but there's absolutely no evidence in the record to suggest a policymaking official or employee of Desert Isle to come to the property. That was the argument made in the briefs. I'm looking back at your – oh, I see. You have a Fourth Circuit case saying that Monell applies to private corporations. Is that it? Is there any Ninth Circuit law? The cases that I have cited are the only ones that I'm aware of, Your Honor. So there's no Ninth Circuit case saying that Monell applies to a private corporation? I presume that to be the case. Okay. All right. Thank you. Thank you. Officer Krupke. If it may please the Court, Craig Anderson, Las Vegas, Nevada, on behalf of Las Vegas Metropolitan Police Department Officer Travis Crumrine. The issue that we're dealing with with Officer Travis Crumrine is primarily the 1983 action as to whether there was probable cause for his arrest of Lori Fowle. He arrested her on two bases. The first was a citizen's arrest for trespass, where he took her into custody for Caesar's Palace. And the second was the obstruction. In order to have the arrest valid, probable cause only has to be established. I thought when he arrested her and made the police report, the arrest was just based on the probable cause for lying to the police officer. Well, he issued he witnessed the citation of Crumrine, which took her into custody for the trespass. And then he also cited her or arrested her for obstruction, too. But I thought you insisted in your brief, basically, that the only thing he actually Yes. Okay. Absolutely. But if there was probable cause for the trespass for him to, because he could then take her into custody for that as well. But suppose he didn't take her into custody for that? For just the obstruction issue. No. Well, there's certainly probable cause. Which is what your brief says, as I understand it. Yes. But the brief says that the only arrest he made was obstruction. Still. All right. So why aren't we going forward on that basis? Why are you reconstructing history now? Well, because the trespass issue gives him the basis also to take her into custody. I understand that. But you are litigating this case on the premise that he didn't do that. Yes. Well, that he didn't arrest her. But he certainly had. But if that was the case, if the trespass issue was valid, then he's protected and you wouldn't even get to the obstruction issue. Why is he protected if he didn't arrest her for that? Because if there's probable cause for the trespass, then he had. There may have been probable cause, but if he didn't arrest her for it, then he didn't arrest her for it. Yes. But then he had the right to take her into custody and then the obstruction issue. All right. Go on. Okay. With restricted the obstruction, the issue is whether she hindered or delayed his investigation. And she clearly did. In fact, at the one point in the video when he asked her, are you lying to me, she says, maybe. She would not tell him the name that she knew. But he didn't have any authority to ask her, at least under the Supreme Court cases. I mean, once he went beyond asking her her name, wasn't he on treacherous First Amendment ground anyway? No, because he wasn't asking her any questions about the trespass. He never asked her, have you been trespassed here before? Have you committed a crime? He was trying to ascertain her identity so that they could get the right person  That's all he was trying to do. Yes. But the Supreme Court case was Hibble. Hibble. Hibble doesn't give authority to ask any questions about identity. It gives authority to ask her name. Yes. And he asked her and she. He asked her a bunch of other things, too. Well, he asked her, you know, she said her name was Laurie Chang and she gave a correct Social Security number and a correct birthdate. Right. And he then rambled into his database and it did not come back as a hit. Okay.  Okay. But does he have any authority without violating the Fifth Amendment to at that point ask her anything else? Other than he could arrest her, but does he have any authority to ask her anything else? Well, he can ask her anything he wants. And she can invoke her Fifth Amendment rights, which she never did. He could ask her any question. You know, a police officer is not prohibited from asking questions. If she had invoked her Fifth Amendment rights, then absolutely he needed to stop. Doesn't have a Miranda obligation at that point? Wasn't she in custody? She was in custody. Right. And if he was asking her questions about the crime, he would have to give a Miranda      He could have given her a Miranda right. I don't know about the crime because the crime depended upon who she was. Yes, the crime depended upon. But now we need to back up on the Fifth Amendment because it's only violated if these statements are used against her in a criminal proceeding. No, it's not only violated. It's only actionable, but it's not only violated. Only actionable, correct. All right. Well, that's different. Okay. And so what he was trying to do was to find out her question. Was she in a position to feel that she was free to leave, that she was not in custody? Absolutely not. She was in custody. She was not free to leave. And didn't her Miranda rights take over at that point? Yes, they would. And anything that he obtained from her in violation of that cannot be used against her in a criminal court of law. And it was not. But he never asked her any questions regarding any crimes that would incriminate her, asking her if she could. Oh, wait a minute. That doesn't make any sense at all. I mean, the only reason he was asking her these questions was because it was an element of the crime, i.e., that she trespassed, that she be the person who was trespassed. Yes. So it went directly to an element of the crime. Yes. All of his questions were to ascertain her true identity. For the purpose of finding out whether she had violated a particular crime which depended on the identity. Yes. Right. So it wasn't just an idle conversation about who were you? Yes. And she had an obligation under the Hybl case to identify herself. Okay. And when she didn't, maybe he could arrest her. But why could he ask all these other questions which didn't go to her name? They may have gone to her identity. But are you arguing that under the Hybl case he could ask any question that might help ascertain her identity, not just what's her name? I would say that, yes, he could ask her questions to ascertain the identity. Including did you drive here and where's her car and stuff like that? Yes. And I think the word this moves us, then, is that... Where are you getting that from? I'm getting it from the fact that it's the Hybl case does not address that issue. So now we're getting into qualified immunity as to whether there's any clearly established law saying he cannot do that. So if you're saying he can't and that very well may be the case, what tells him he can't? And that would move us into qualified immunity on that issue. The general law of Miranda, which is you can ask people questions that involve an investigation into a crime to which Hybl was an exception. Yes, but Hybl said you have to identify yourself. That's what he believed he was doing. He believed he was asking questions to ascertain her identity because he had the right to do so. Now, if the case is you can only ask what's your name and you're stuck with that answer, there's no law telling him that. And so that's when we would move into qualified immunity, that he would need clearly established law telling him that those questions were improper. He would be, sorry. All right. But meanwhile, then the lawyer shows up and explains the whole thing about her name. Okay. Well, now you've got to put yourself in a police officer's, in this police officer's situation. He shows up and they said, we trespassed Shea Yudeng. She says, my name is Laurie Ching. A person who says he's an attorney, how would the officer know that? He could have asked. He could have asked, but shows up and says, by the way. And he presumably knew this guy, but leaving that alone, it was easy to find out. But then what the attorney tells him is you have Laurie Tsao. That's not a name this officer has ever been given. And then he explains why. Yes. Well, he gives his opinion why. But now, well, now you've got a police officer. So if a police officer. And he offers to call her husband to confirm it. Well, now we're getting into Nevada law where we can only detain a person for an hour. And so how far. Wait a minute. Who? A police officer can only detain? Under Nevada statute without probable cause to arrest. But she was. But I thought you said there was probable cause. Excuse me? You didn't have probable cause?  There was probable cause. And she was detained. The more you say you can't detain them for more than an hour without probable cause. Well, that was a mistake on my part because it was probable cause. But there is a statute that only allows the police to detain for an hour. All right. But what you've got now with this police officer is how much investigation does he have to do? Mr. Narcissian has said, look. What's distressing about this is that there are millions, tens of millions probably, of women walking around with their husbands' names and with dual names in either their husband's name and their own name. And no obligation to go get an official name change. And that's the explanation he got. It was not a weird, crazy explanation. It was a perfectly common, you know, everyday explanation. Well, the explanation he got is he goes out and Mr. Narcissian says, you have Laurie Tsao back there. He goes, I don't have Laurie Tsao. I have Laurie Chang. So then he changes his story. He says, oh, well, let me tell you who Laurie Chang is. That's her maiden – that's her married name that she's now using. But as you can see from the discovery that was revealed in this case, she's never used that name. The only place – I thought it was on her passport. But she also has testified under oath that she has fraudulent passports that she obtains from people to prevent people from – Is anybody doubting that she's married to a man named Chang? No. No one is doubting that. But how would a police officer know that actually? Because he was at – he said he would bring the man over and tell him. But at the same point, he has Clinton Makeley telling him, I trespassed this person's Shea Yu Dang. And so he's getting two sides of the story. He's doing an investigation, and he has to make a decision at some point. Well, he doesn't really. I mean, arresting somebody for not giving their name is a pretty strange thing to do to begin with. So he could have just dropped the whole thing. Well, he didn't arrest her under that statute. He arrested her for obstruction because she did hinder and delay his investigation as he was simply trying to get her cited so he could get out of there and go do other police work. That's all he was trying to do. Mr. Anderson? Yes. Could you help me back with the Miranda problem? When Crumline asks, don't you know you're supposed to have a driver's license with you? Well, where's your car parked? My car is being driven by my friend. You drove it here, then your friend took it away. Yes, that's right. Are you lying to me right now? Oh, all right. Well, the next question I ask you is very serious for you not to lie to me, because if you lie to me, I have to take you to jail. Do you understand? Are those all with a view to establishing identity? He was trying to ascertain whether she had driven because he knew her name would be on a driver's license. But wasn't there another issue, too, which is that the statute requires that she first be notified, that she has to answer the question of pain of arrest, and the only question that she was asked to which she was so notified was her name. Isn't that a probable cause problem as to the other issues? Okay. I'm sorry. Can you go on? Wasn't it a probable cause problem as to whether she could be arrested for obstruction for not saying whether she had driven there, that she wasn't given the notice that she was given by him that she had to answer it on pain of arrest was after that and only with respect to her name? Well, that, again, I don't know that the law is clearly established there. I understand exactly what you're saying. No, but I thought that's just in the statute. I thought that's not a question. But that's he can't have probable cause under the statute unless he first gives her this notice. But the arrest then would have to be for her. Not giving her name. Not giving her name. Right. And that's where you run into things. I think you have Miranda problems, but you have, I think, big problems with regard to this name thing, because it was all explained. But the Miranda is only actionable under 1983. I understand that. But I'm saying you can wash out all the Miranda stuff, because the the she couldn't have been arrested for obstruction for the answer she gave that didn't relate to her name. Okay. But she could have been arrested for obstruction for not giving the name on her driver's license so that he could identify her. And I think that's very. Did he ask for the name on your driver's license or did he ask for her name? Well, he asked her if she had a, when she gave the name Lori Chang, he then later asked her, do you have a driver's license?  And what does she say? She says, I have a passport. And then he says, do you have a driver's license? She says yes. Then she says yes, but she does not. She never gives the name Lori Tsao. Never. Okay. During the entire time. Did he ask her for the name on her driver's license? I don't think he ever directly asked her for the name on her driver's license. And, you know, I think that's clear from the record what he inferred was that she. Well, when did her lawyer explain to the officer her various names and her use of them? About, well, I think it was two hours after she had initially been taken, so probably about 40 minutes after Officer Crum might have been there. But Mr. Necessi, no better. I mean, before she was arrested. Yes. Before she was arrested. And that's not in the police report. Well, not in the police report. I mean, the officer was told about her name. He was? And that he could verify it. He'd have the husband come down and verify it. It's not as if the officer only knew that he knew her under one name and he or she was using another name. Well, the officer knew three stories. The one from Mr. Makeley, the one from Ms. Sal, and the one from the attorney. He did a complete investigation. It's just that Ms. Sal does not like the decision he came down on. He did investigate it. He looked. Now, you have to remember that when he looked at. But she was arrested for what? For not telling him a lie. Well, yeah, for not telling the name that he could identify her by. The name Lauren Chang is in no database. What was her lie? That her name was Sal, right? It wasn't that it was a lie. It says she was willfully hindering and delaying his investigation by not giving him a name. Well, it says providing false information is what the report says. I arrested her for providing false information to a police officer, NRS 197-190. So the analysis that. So the false information was that her name was Laurie Sal? After he investigated. The false information was giving the name Laurie Chang and not the name Laurie Sal. And there just has to be a reasonable explanation why he reached that decision. And he wasn't he was not given a reasonable explanation by the attorney. He was given three different explanations. Now, the police officers probably the police officers in a domestic battery or all of these type of issues are giving several different stories. Why was he given three different explanations? Well, he was given an explanation by Mr. Megley that Shea Yu Ding, the body in the room, had been trespassed. Laurie Sal said, my name is Laurie Chang. Now, what's interesting, too, is when she gives her name, she spells it. She says Laurie Sal Chang, but she spells it C-A-O. The reason is so he will not find the correct spelling to find her name in the database. But she gave her correct Social Security number. And she gave her correct birthday. But she testified that I didn't. Wouldn't be too hard to find her. It wasn't too hard to find her. Well, and they did find her. But the officer made a reasonable conclusion that she had attempted to willfully hinder and delay his investigation, which she essentially admits she did. That she did not want him to learn that name. I mean, that's not in dispute. She admits she was trying to conceal the name Laurie Sal from him. And so is that reasonable? Well, it says she was placed under investigation for providing false information to a police officer. And so what we need to look at is whether that was a reasonable conclusion based upon all the evidence. And the officer made a decision, which he's entitled to do. He has to accept one party's story and then make the decision. But he certainly did a complete investigation. And he did talk to everybody. It's just they don't like his outcome. And if he sided with Mr. Nesessian, then would Clint Makeley be able to sue, saying he didn't believe me? They have to make a decision. There's always two sides to every story when a police officer shows up. And there's always different stories. It seems to me it's not necessary to put somebody in jail for 10 hours because you're not quite sure what your name is when it's been explained to you. It may not be necessary, but it's allowed. And the reason was so that she could be fingerprinted and then they would have in a database this problem would not come up again. But I would like to stress the issue of qualified immunity here at a minimum, as to whether there is clearly established law that he could not ask questions such as, do you have a driver's license? Because those were not to implicate her in the crime of trespass, which he was there to investigate. Anything else? No, thank you. Thank you. I can't keep your name straight. You can say thank you. That would be fine from our standpoint. But you may also have a minute or two to rebut. Well, we did have this one question about the – which both Judge Pollack and I have been talking about, both the application of Monell to private parties and whether this is a vicarious liability or not anyway. The application of Monell to private parties in the circumstances in this case is not so much the question because this is not purely a case of vicarious liability. I'm trying to understand. And I'm finding a hard time seeing what's different about – I understand that corporations only act through people, agents, but that's true also of cities and states. So the whole Monell notion of what is vicarious liability seems to deal directly with the question of when is the entity going to be held responsible for what an employee does, even if the employee is otherwise essentially acting within their authority. Well, this is the security supervisor. So we first run into the question of whether or not this does become the – he's the chief security guy on premises when all of this is going on. More importantly, Monell does not provide a rule that when the entity puts into place two programs that will invariably eventually collide and result to a totitious injury to a third person. You're saying it's a policy. It is policy. And you can't get – it's policy and practice. And this idea that the marketing department didn't intend for her to be arrested and seized, that's not part of – nobody said the marketing department committed a tort, but yet it's an integral part of everything that we're here for. And that's part of the reason why the Monell analysis does not fit in this case, because the policies and procedures that are already in place, in practice – I think we have five invitations now that are in this record after the trespasses. Even after the case was started, this is policy, and it's policy exemplified through the evident practice that is repeated time and time again. And the judge, incidentally, did – the district judge recognized that one of the I'm not clear where – what does the repetition of the invitations tell us with respect to the policy and practice of the casino hotel? If they really want her to not come back, then that policy and practice – or what does it tell us? It tells us that as a collective group, Caesar's Palace and Desert Palace is, in a word, insane. Okay? Because they did it even after the lawsuit was started. It's an aspect of a 1983 action. It's a defense. Thank you, Your Honor. It also tells us that they just don't care. They're above the law. That's their perspective on all of this. I want to point out very quickly that the police officer does not have to accept one party's story or another. That is a statute in domestic violence. That is not here. What the police officer here has to do is either say no probable cause and not arrest or thank you, I will let you go. I will continue to investigate until I determine whether or not there is probable cause. There is no ability to arrest hoping that probable cause comes up later or that the other half of the story you were told, the explanation you were given, doesn't prove true. As to being in a database, she's in the Nevada DMV database. She's in an immigration database. We know she's in a passport database. And yet the excuse given here today is, well, we had to get her in a database so that we could find her again if we did want to go forward. And that puts her in jail. That's not a constitutional standard. I could go on and on. Well, don't do that. So I'm not going to. But I do want to point out one other thing. If you look at the affidavit of Robert A. Nersessian that is attached to the record, I have it open to the public. Page 257 of the Appellant's opening excerpts or Appellant's excerpts of record. It was the security guard, not Makeley, but the security guard, Makeley's employee, who was first told that there is an invitation. And then the affidavit goes on to say that he then had a conversation with Makeley, but the lawyer was prudent enough or concessionary enough to let that conversation go on privately and did not listen in and stepped away, hoping to talk to whoever's holding Ms. Zao. And they are asking that they are stating, both of them, there is no indication whatsoever that Mr. Makeley ever had knowledge of this invitation. Cesar's security did have knowledge before she was taken away to jail for trespassing. Thank you very much. Thank you, counsel. I'm sorry, Judge Pollack. I didn't get to your specific question. You did, actually.  I did. It's all right. I'll forgive you. All right. Thank you very much. The case just argued will be submitted.
judges: Pollak, Reinhardt, Berzon